### KNAPP *v.* BENEDICT and another.[1]

*(Circuit Court, D. Connecticut. February 12, 1886.)*

1. PATENTS FOR INVENTIONS—INFRINGEMENT.

To a bill for infringement of letters patent No. 189,233, of April 3, 1877, to Henry F. Knapp, for means for relieving stranded vessels, the only defense was non-infringement. The defendant had used the same methods for relieving a vessel, which had been in frequent use since 1860 for removing sandy obstructions, and therefore *held* that he did not infringe.

2. SAME—JUDICIAL NOTICE.

The court is permitted to avail itself of common knowledge in regard to matters of science, (*Brown* v. *Piper*, 91 U. S. 37,) and by that knowledge to define the scope of a patent.

In Equity.

*Edwin H. Brown,* for plaintiff.

*Rufus S. Pickett,* for defendants.

[1] Reported by Charles C. Linthicum, Esq., of the Chicago bar.

SHIPMAN, J. This is a bill in equity to restrain the alleged infringement of letters patent No. 189,233, granted to the complainant, April 3, 1877, for an improvement in means for relieving stranded vessels. The only defense which is set up in the answer is non-infringement.

The invention is thus described in the specification of the patent:

"This invention consists in certain novel means of manipulating a stranded vessel, so that she may be relieved with facility; and consists in introducing within her hold one or more main tubes, which are tapped at intervals by small pipes, that are made to pass out through small apertures in the bottom of the vessel on either or both sides of the keel, and are fitted air or water tight for the purpose of forcing water through the entire arrangement of pipes, so as to soften the sand, as well as to lubricate the contact or friction of the sand or mud against the outside skin of the vessel, and thus enable her to move more readily by means of warping-lines. As vessels that run ashore on sandy coasts are rapidly 'banked up' with sand by reason of the peculiar action of the sea, it is an important feature of this invention that such banking up can be largely avoided, as well as reduced, by the means herein described; also the running action of the sea will, at times, cut away the sand, etc , from under a portion of a stranded vessel, leaving her to rest on an uneven foundation, which causes her to not only strain badly, but to frequently be the cause of her breaking to pieces. This result I propose to avoid by softening and washing or blowing away the sand from under that part of the vessel that is not already cut away by the action of the sea, so as to secure an even foundation and bottom for her along her whole length. Again, vessels that go ashore on sandy beaches most frequently take a position broadside to the sea, and, as their flotation is facilitated by getting them end to the sea, this may be accomplished by ejecting the fluid into the sand, under the starboard side forward, and port side aft, or *vice versa*, according to the circumstances of her position, all in order that she may be gradually slewed around, as desired."

The first claim is as follows:

"(1) The process herein described of relieving stranded vessels, by causing them to float in a fluid or semi-fluid, by means of forcing continuous streams of fluid, immediately around its bottom, into the sand or mud in which the vessel is embedded or lies, for the purpose of washing away and softening the sand, while at the same time a lateral movement or strain is imparted to the vessel by means of warping-lines or equivalent means, whereby it may be moved into deeper water, substantially as and for the purpose set forth."

On January 9, 1884, the Robert Morgan, a new schooner of 552 tons, which was commanded by the defendant Crossley, went ashore, broadside, on the beach at Atlantic City. A contract was made with a wrecking company to put the vessel afloat, and operations to that end commenced about the middle of February, which, prior to May 24th, resulted in slewing the schooner around with her stern towards the ocean. The captain thought that there was wreckage or some hard substance under the vessel which prevented her progress. He had seen on the beach at Atlantic City, the sinking of piling or posts by the aid of a stream of water forced into the sand at the bottom of the post, and had also been shown by the managers of the water-works company the effect of a stream of water upon sand, and he thought that the obstruction could be removed or sunk in the sand

as the result of a similar plentiful injection of water through a nozzle under the vessel. He therefore contracted with the Atlantic City Water-works Company to lay pipes and hose to the schooner, and to furnish him water through the pipes. The ends of these pipes were thrust into the sand under the vessel, to the depth of seven or eight feet, and water was let into the hose from the city hydrant for four days from May 24th to May 27th. The consequence was that the sand under the vessel was in a semi-fluid state, the vessel sank some feet, and if there was any wreckage it disappeared. The use of the water was objected to by the wrecking company, and was discontinued. On May 24th the log-book says that the sand was cut out about 30 feet, and the vessel was moved nine inches. The log of May 26th says as follows:

"8 P. M. Vessel started to roll, rolling slightly for about an hour, and for the first time since she came ashore. Rolling caused by the three streams of water amid-ships. * * * Moved altogether this tide 15 feet."

On June 11th the vessel was got off from the beach.

As the court is permitted to avail itself of common knowledge in regard to matters of science, (*Brown* v. *Piper*, 91 U. S. 37,) and by that knowledge of the state of the art to define the scope of the patent, such knowledge in regard to the use of a jet of water through a pipe and nozzle, for the purpose of lowering piles into sandy foundations, and of removing sandy obstructions, shows that the defendant did nothing except what had been in frequent use since 1860, and did not infringe the patent.

The bill is dismissed.